Filed 6/3/13  P. v. Holmes CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>REGINALD HOLMES,<br><br>    Defendant and Appellant. | B236128<br><br>(Los Angeles County<br>Super. Ct. No. TA090560) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Ronald S. Coen, Judge.  Reversed and remanded.

_____

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

_____

An amended information, filed on June 27, 2011, charged Reginald Holmes with two counts of murder (Pen. Code, § 187, subd. (a))[1] and one count of being a felon in possession of a firearm (former § 12021, subd. (a)(1)). As to the murder counts, the amended information alleged (1) firearm use enhancements under section 12022.53, subdivisions (b), (c) and (d); (2) the special circumstances of multiple first or second degree murders (§ 190.2, subd. (a)(3)) and lying in wait (§ 190.2, subd. (a)(15)); and (3) a prior conviction for shooting at an inhabited dwelling (§ 246) that qualified as a serious felony under section 667, subdivision (a)(1). As to all three counts, the amended information alleged that Holmes had (1) committed the offenses for the benefit of, at the direction of or in association with a criminal street gang within the meaning of section 186.22, subdivision (b); (2) served four prior prison terms pursuant to section 667.5, subdivision (b); and (3) suffered the prior conviction under section 246, which constituted a strike under the "Three Strikes" law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).

The People's theory at trial was that Holmes, a member of the Six Deuce Harvard Park Brims, a Blood gang, obtained two firearms, a Colt .45 and a .380 semiautomatic, from a fellow gang member in the early morning of April 22, 2006, and several hours later either shot or had shot by his protégé in the gang Patrick Hemingway and Michael Taylor, who had taken Holmes to buy marijuana. Holmes's theory in defense was mistaken identification based on descriptions of the assailants that did not match Holmes's characteristics, conflicting eyewitness testimony and the absence of forensic evidence connecting him to the crimes.

The jury found Holmes guilty on all three counts and found true the two special circumstances, the firearm use enhancements under section 12022.53, subdivisions (b) and (c), and the gang allegation. The jury found not true the firearm use enhancement under section 12022.53, subdivision (d). In a bifurcated proceeding, the trial court found that Holmes had a prior serious felony conviction under section 246

---

[1] Statutory references are to the Penal Code unless otherwise noted.

that qualified him for sentencing under section 667, subdivision (a)(1), and the Three Strikes law and had served four prior prison terms within the meaning of section 667.5, subdivision (b). The court sentenced Holmes to state prison on counts 1 and 2 to consecutive terms of life without the possibility of parole, plus on each count 20 years for the section 12022.53, subdivision (c), enhancement, and 10 years for the gang allegation. The court imposed an additional five years for the section 667, subdivision (a)(1), enhancement and three years for the section 667.5, subdivision (b), prior prison terms. As to count 3, the court imposed a sentence to run concurrently to that on count 1. The court imposed 10 years for the section 12022.53, subdivision (b), enhancement on counts 1 and 2 but stayed execution of those terms pursuant to section 12022.53, subdivision (f). It also imposed and stayed execution of a one-year term for the remaining section 667.5, subdivision (b), prior prison term because that conviction had been used for the section 667, subdivision (a)(1), enhancement.

On appeal, Holmes argues evidentiary errors, prosecutorial misconduct and ineffective assistance of counsel, either each independently or some or all cumulatively, require reversal of the judgment for a new trial. He also argues sentencing error with respect to the gang allegation. We agree with Holmes that evidentiary errors require reversal of the judgment. We thus reverse the judgment and remand the matter to the trial court.

## DISCUSSION

1. *The Failure to Redact References About Holmes in a Recorded Statement of a Witness Interview Constituted Error*

   a. *Proceedings regarding witness recorded statements*

   Theresa Cherry, an affiliate of the Six Deuce Harvard Park Brims and Holmes's friend, was stopped by police two days after the shooting when she was riding in a car as a passenger of Holmes's wife. The police arrested Holmes that day in connection with the killing of Hemingway and Taylor.

   The following year, police detectives interviewed Cherry, who was in custody on unrelated charges. Cherry reported that on the morning of the shooting she heard that

3

two men had been killed. She learned this information from "Baby G.S." or Baby Gunsmoke, Holmes's protégé in the gang. Holmes was known as "Big G.S." or Big Gunsmoke. Holmes told Cherry that he had concluded that the two men who were killed were trying to set him up to "smoke him." Cherry believed that Holmes had shot the men because he thought that they were going to kill him.

The next month, a polygraph examiner interviewed Cherry. Although no polygraph examination was administered, Cherry gave a statement to the examiner in which she said that Holmes had told her that "the guys that he killed were trying to kill him. He said that they were trying to set him up some kind of way to have him go to the . . . hood" of a rival gang. According to Cherry, "I guess the two guys were in the front and passenger seat, the driver and passenger seat, and I guess [Holmes] was in the back. You know, he said he had them pull over . . . and he shot both of them in the back of the head. I don't know how they died, but this is what he said. I don't know how those guys died, but the detectives said they were executed so maybe they were shot in the back of the head or something. . . . Well, he said he shot them both in the back of the head and his wife followed and he got out of that car and got in the car with his wife and they drove off. And the same car that they drove off in was the car that they were in that Sunday when they came and got me and my friend."

Later that day, police detectives interviewed Cherry again. During that interview, Cherry said Holmes had told her that he "smoked two dudes." "Baby G.S." was at the scene, and Holmes left the area with his wife. Cherry saw Holmes at his residence the day after the shooting wiping off two firearms, a "revolver, a chrome one," "a .38 or .32 or something like that" with "a wooden handle" and a black one.

At trial, Cherry, who still was in custody on unrelated charges, admitted to testifying at the preliminary hearing that Holmes had told her that he killed two people who he believed were attempting to set him up. Cherry also admitted to testifying at the preliminary hearing that after the shootings she saw Holmes wiping off two firearms. Nevertheless, at trial, she testified that Holmes had not told her that he killed anyone. She also testified that she had not seen Holmes wiping off firearms after the shootings.

4

Cherry claimed that she had lied in her interviews with police detectives and the polygraph examiner and at the preliminary hearing. Cherry said that she feared for her safety as a witness in this case because someone could try to kill her.

Given the inconsistencies between Cherry's trial testimony and her earlier statements and preliminary hearing testimony, the prosecutor sought to impeach Cherry by playing for the jury recordings of the interviews she had given to the police detectives and the polygraph examiner. Defense counsel objected, "It's my understanding with this witness[,] Ms. Cherry, that the People were going to attempt to play the entire taped interviews of her interviews with officers. If that's the case, I would be objecting to certain portions as there is double hearsay throughout that. Statements that should not be allowed to come in." The trial court responded, "First of all, I overruled the objection because [the statements were] offered for different purposes [to go to Cherry's state of mind as to why she feared testifying at trial]. The redaction of such would be at this time too complicated, as I take it just from listening to the witness, she said different things at different times. I would be glad to give a limiting instruction, and if you want to proffer one, I will consider it, or I can give my own. But just that I can say relates to statements of others, other than the defendant, are not to be received for their truth. . . . And again, I'm basing it just on the testimony of the witness herself, understanding that the request for a redaction will be too much." Defense counsel expressed concern that with the statements played to the jury, and on the transcripts that the jury would have with it during deliberations, he did not know that a limiting instruction would "un-ring the bell."

Three recordings were played to the jury, and the trial court instructed the jurors with respect to each of the recordings that it could not consider statements by third parties other than the defendant for their truth. During one of her recorded interviews with police detectives, Cherry stated regarding Holmes that "[h]e's on parole. I guess the guy has two strikes and he's on parole . . . ." Later in the interview Cherry reported that Holmes had "said that he went to jail for murder. But see, before he told me that, I had already heard that from other people anyway so I wasn't tripping. . . . And I heard that he was on probation for a gun . . . ." The detective asked, "But he has talked . . . about

5

his . . . rap? . . . You know, he's . . . originally, from, like, the Blood Line." Cherry responded that Holmes had said, "'Yeah, I've been in jail for murder before, and you know, I did eight years for that . . . .'" Cherry also said referring to Holmes that "he's on parole, a strike . . . ." And the detective referred to Holmes as "this [p]arolee, been . . . in the prison for killing people, . . . he's Blood Line. . . . You don't just . . . walk up into the Blood Line, like, 'Hey, I'm here. Let's go.' . . . There's a . . . process to get up to the Blood Line . . . [.]" The detective told Cherry that "you said yourself [Holmes's] on parole for guns, he's . . . been [i]n prison for murder . . . from the Blood Lines, he's got, you know, . . . a good reputation. . . . He's talking all this stuff. He's steady with a gun, correct?"

After the playing of this recording, defense counsel stated, "Notwithstanding court admonition to the jury, I believe that those statements are so egregious as it relates to this case involving my client who allegedly went to prison for murders[,] which he did not, he was never convicted of murders . . . [.] Again, bad acts, nothing to support it. There is no reason for the mischaracterization of my client, and I don't believe that the jury can separate all of that, especially when it's coming from a police officer claiming to have the authority of the courts and discussing this with the jury. I know what the court has said, but I just don't believe that they could possibly ignore what has been given to them by the police." The trial court responded, "Well, I'm somewhat disappointed in that [prosecutor] you should have seen this coming and given me a warning, but you didn't. I don't feel that this was as egregious a matter that would call for a mistrial, if that's what you're moving for. . . . I gave a complete and full admonition, and I got a verbal response from every single one of the jurors they are going to follow that admonition. Motion for a mistrial is denied. [Prosecutor] don't do this again." The prosecutor stated her belief that the statements were relevant to Cherry's state of mind to which the court replied, "Well, I think that she mentioned it as to her state of mind that would be one thing the fact that the officers stated to her. . . . But in any event, the record is made. The motion is denied."

6

b.      *Prejudicial error in admitting the unredacted recorded statements*

Holmes contends that playing the unredacted version of Cherry's interview with police detectives with the references to Holmes as someone who had been in prison for murder, had two prior strike convictions, was on parole and was a member of the Blood Lines constituted prejudicial error.  The People, on the other hand, contend that the statements on the recording were relevant to Cherry's state of mind, helping to explain why her trial testimony was different from the information she had given to the police detectives, and that in any case they did not prejudice Holmes.  We agree with Holmes.

Even if, as the People argue, the statements bore some relevancy to Cherry's state of mind, the trial court should have excluded them, pursuant to Evidence Code section 352 (section 352), by redacting them from the recording.  Under section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice."  "'A careful weighing of prejudice against probative value under . . . section 352 is essential to protect a defendant's due process right to a fundamentally fair trial.' [Citation.]" (*People v. Miramontes* (2010) 189 Cal.App.4th 1085, 1097.)  The court did not undertake that careful weighing.  Although defense counsel objected to the playing of the recording on the ground that it contained prejudicial hearsay statements, the court did not listen to the recording before the prosecutor played it to the jury.  It declined to excise any statements from the recording on the ground that doing so would be "too complicated."  The jury thus heard the numerous statements on the recording referring to Holmes as having a criminal past, including being in prison for murder, on parole, a two-striker and a member of the Blood Lines gang—even though those statements were not true.  Although the court instructed the jury not to consider the statements for their truth, such instruction did not cure the failure of the court to listen to the recording and exercise its discretion under section 352 as to statements regarding Holmes that admittedly were not true.  (*People v. Finch* (1963) 216 Cal.App.2d 444, 453 ["There can be no doubt that before permitting recordings to be played to the jury the court should satisfy itself that they are substantially complete and substantially correct as

7

to matters that are material and important"].)[2] Given the connection between the murder charges against Holmes and the statements that he had been in prison for murder, was on parole and had two prior strike convictions, the probative value of the statements was substantially outweighed by the probability that they would create substantial danger of undue prejudice. Admission of the statements thus constituted error.

The error was prejudicial, whether harmless error is judged under the state standard in *People v. Watson* (1956) 46 Cal.2d 818, 836 or the federal constitutional standard in *Chapman v. California* (1967) 386 U.S. 18, 24). Holmes defended the case on the theory of mistaken identification. Playing statements to the jury that Holmes had been in prison for murder, was on parole and had two prior strike convictions set the tone that Holmes was the type of person to commit the charged crimes. In addition, one of the prosecution's key witnesses on identification was equivocal in his testimony and suffering from mental and physical problems. Moreover, no forensic evidence tied Holmes to the shootings. And, as noted, the subject of the statements was closely connected to the charges against Holmes. Under these circumstances, reversal of the judgment is required.

2.    *The Scope of the Gang Expert's Testimony Contributed to the Erroneous and Prejudicial Admission of Evidence*

Los Angeles Police Department Officer Everardo Amaral testified as an expert on the Six Deuce Harvard Park Brims, a Blood gang formed in the 1970s and claiming about 240 active members in 2006 at the time of the murders in this case. According to Officer Amaral, the gang had a hierarchy, "different levels. You have what you call your O.G. gangsters, which are your older members of the gang. You have shot callers, . . . a shot caller is a person within a gang who organizes crimes, plans out crimes and has the younger or more active gang members commit those crimes. And you have your wannabe[]s, or your associates or [y]our affiliates. An affiliate is somebody [who]

---

[2]    Even though one of the detectives testified that a statement made to Cherry in her interview that Holmes had been in prison for murder was not true, that testimony did not address any of the other statements on the recording, nor did it necessarily remove for the jury any doubts as to Holmes's criminal past.

identifies or doesn't claim or doesn't have a moniker, but still commits crime with the gang."

Officer Amaral knew Holmes to be a member of the gang in 2006 with the moniker "Big Gunsmoke, or Big G.S." Holmes's role in the gang was as an "older member, so he would be either O.G. or be a shot caller." Holmes had several tattoos representing the gang, including one that said "C.K. Finest," which the officer interpreted to mean that Holmes is a "member of a Blood gang" and "a Crip killer." The term "C.K." is short for "'Crip killer.'" Officer Amaral knew Abadji Franklin as a member of the gang in 2006 with "the moniker of Baby G.S.[,] which is [short for] Baby Gunsmoke." The officer had two contacts with Holmes, and both times Franklin was with Holmes. "Their relationship was like a father and son relationship. Mr. Holmes was teaching the young member how to be, you know, a gang member. He was teaching him everything he knows as he can be as successful as a gang member." According to the officer, "based on [his] experience from talking to other gang members as how they bring up these younger gang members[,]" although he did not know firsthand, Holmes "possibly had some influence on actually motivating [Franklin] to go out and commit these crimes." Given a hypothetical question containing the evidence presented to the jury, Officer Amaral opined that the crimes were committed for the benefit of the Six Deuce Harvard Park Brims.

Holmes contends that the admission of Officer Amaral's testimony that Holmes "is a Crip killer" and his opinion that Holmes "possibly had some influence on actually motivating [Franklin] to go out and commit these crimes" constituted improper expert opinion. We agree that admission of these statements was error.

"'California law permits a person with "special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness [citation] and to give testimony in the form of an opinion [citation]. Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." [Citation.] The subject matter of the culture and habits of criminal street

9

gangs . . . meets this criterion.' [Citation.]" (*People v. Vang* (2011) 52 Cal.4th 1038, 1044.) "'Generally, an expert may render opinion testimony on the basis of facts given "in a hypothetical question that asks the expert to assume their truth." [Citation.]' [Citation.]" (*Id*. at p. 1045.) Nevertheless, "expert testimony regarding the defendant's guilt in general is improper. 'A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] "Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt."' [Citations.]" (*Id*. at p. 1048.)

Officer Amaral's statements that Holmes "is a Crip killer" and that he "possibility had some influence on actually motivating [Franklin] to go out and commit these crimes" were not opinion testimony based on hypotheticals but rather expressions of opinion on Holmes's responsibility for the crimes. Although an officer testifying as an expert on a particular gang may give his opinion on the gang's culture, including the gang-related significance of a defendant's tattoos (*People v. Ochoa* (2001) 26 Cal.4th 398, 438, abrogated on other grounds as stated in *People v. Prieto* (2003) 30 Cal.4th 226, 263, fn. 14), Officer Amaral did more than state that "C.K." in Holmes's tattoo stood for "Crip killer." The officer stated that the tattoo "C.K. Finest" showed that Holmes "is a Crip killer." Such statement expressed the officer's belief that Holmes is a killer. With respect to the officer's statement that Holmes "possibly had some influence on actually motivating [Franklin] to go out and commit these crimes," the testimony was beyond the permissible scope of expert opinion because it expressed the officer's belief that Holmes was involved in the charged crimes. The statements thus were not limited to opinion based on hypothetical questions but rather improperly encompassed the officer's opinion that Holmes was responsible for the crimes at issue.

Given the prejudicial statements in Cherry's interview with police detectives that Holmes had been in prison for murder, had two prior strike convictions, was on parole

and was a member of the Blood Lines gang, the testimony from the gang expert that Holmes "is a Crip killer" and possibility influenced his protégé in the gang to commit the murders further prejudiced Holmes before the jury. The gang expert's testimony reinforced the prejudicial statements in Cherry's interview. The jury thus was impermissibly led to believe that Holmes had committed previous crimes and those charged in this case.[3]

## DISPOSITION

The judgment is reversed, and the matter is remanded for further proceedings not inconsistent with this opinion.

NOT TO BE PUBLISHED.


ROTHSCHILD, J.

We concur:


MALLANO, P. J.


JOHNSON, J.

---

[3] Because we reverse the judgment on evidentiary grounds, we need not address Holmes's contentions of prosecutorial misconduct, ineffective assistance of counsel and sentencing error on the gang allegation.